You may be seated. Counsel, when you're ready. Good morning, Your Honors. Good morning. Name is Kristen Farr. I represent the appellant, Mary Frances Herkert, in her case against the Social Security Administration. Ms. Herkert is an ambitious and dedicated federal employee. Excuse me, Counsel, could you speak up a little bit? Pull your mic down a little bit. That's good. A little shorter than prior, Counsel. Ms. Herkert is also an individual with several disabilities that require consistent monitoring and treatment. Therefore, she has several medical appointments every single month, and she requires time off work or a flexible schedule to attend those medical appointments. She took this job at the Social Security Administration in 2015, leaving a position at the General Services Administration. And at that time, she tried to ensure that she would have the same accommodations as it related to telework when she went over to the SSA. Although there was some issue with getting that taken care of, she eventually got one day a week of telework. And then she also took advantage of SSA's episodic telework. And that worked relatively well until August of 2017 when her supervisor denied a request for episodic telework. At that time, she escalated it. She sent an email on August 14th of 2017 to her second and third line supervisors, specifically saying that she needs a reasonable accommodation and wanting to speak to them about it. Four days later, she has a meeting with her supervisor to discuss alleged performance deficiencies. It is clear from the record that her first three level supervisors did not like the fact that she was taking all of this episodic telework. The common theme throughout it is that she is taking this for convenience. That she wanted to take telework whenever she wanted to. But her reasonable accommodation clearly states a time frame. She requested two to five days per pay period. She was already having two days, so that's just an additional one to three days of telework per pay period. Her supervisors wanted her to essentially take, to use this telework for her medical conditions. And when other things would arise, that's really where the conflict came up. But episodic telework, telework is a term and condition of everyone's employment. And if she is not allowed to use telework for other things as well, unfortunately being disabled does not exempt you from having your garage door break. It does not, you still have family that will come in town to visit you if you're disabled. You still have to sit in traffic if you're disabled. So all these things that a non-disabled employee can take advantage of and use the episodic telework to use their regular day of telework to deal with these things. Ms. Herkert was essentially not allowed to. When she wanted more episodic telework or more approved telework, her supervisors essentially accused her of taking too much time. Or getting more than what she deserved. If I can just jump you ahead a little bit, counsel. In the end, right, your client got what she was asking for. She was reassigned to a job where she would have more flexibility and she could get, I think it was two days a week. So maybe... Right, that came at the expense of her supervisory duties. Okay, so let's talk about that. And so you have the first reassignment, which is really the most severe. This comes in the end of September when she is, even though it's the same grade, same pay, she is in a position that she formally supervised. And that is embarrassing. I mean, you are now peers with the people that you used to supervise. And you still have to deal with these people that you have alleged have discriminated against you. They were still in her supervisory chain. So if you could address this in a legal context, what you're saying is this makes it an adverse action? Yes. It's an adverse action. And for the disability claim, I think it's clear that Muldrow v. St. Louis, there's no heightened material adverse standard anymore. It's just some harm. And I think certainly being transferred to a position that you used to supervise constitutes some harm. But the record said that she was excited about the transfer, didn't she? That's the second transfer. Oh, the second one. Okay, this is the first one.  Yes, this is the first one. I think it's clear that that constitutes some harm. Now, she was given the opportunity after she complained to her fourth-level supervisor that she was then given another position. This is still not a supervisory position, but it takes her out of the chain of command that she is having conflict with, and it takes her away from the people that she used to supervise. So now it's not coming into work and having to see these people that you used to be their superior, and now they're your peers. So she does accept that. And yet, she did not want to burn bridges. She thanked her fourth-line supervisor for that opportunity. Well, was that an adverse action? Yes, I think that is still an adverse action. Because it was not supervisory, you're saying, per se, it was adverse? Yes. Okay. Well, let me just ask you a hypothetical then. You're saying if someone goes from supervisory to non-supervisory, it's always adverse? What if you were going to non-supervisory and getting a $25,000 pay raise? Would you still say it was adverse? You see what I'm saying? Right. I'm not sure it's categorical like that. The context matters. Okay. I mean, sometimes in your career trajectory, you get a promotion that takes away supervisory duties. Okay. So you're saying it doesn't matter that it was a different division, that nonetheless it was non-supervisory, so it was adverse? Yes. And it's clear she wanted to be a supervisor. How do we deal with her email? Are you saying then that she was grateful for the opportunity? Are you saying that that simply goes to a question of factually as to voluntariness, or how do you work her response into the legal framework that we have to consider? Right. I think that's a question of fact as to whether or not it's truly voluntary. I don't think that – she was grateful not to have to be in that other position, but that does not mean that she is grateful to have her position stripped from her. I mean, these are two different analyses. So in the context that you're saying, you would never have summary judgment because it would always be a matter of fact. Well, I just felt that I wanted to be a supervisor, and that's the way I feel, even though I was excited and put it in writing at the time. But now I just felt – so you'd never have summary judgment because you would say it's just totally a state of mind, right? Well, I mean, as a plaintiff's attorney, sure. I guess I'd always say that summary judgment is an appropriate – Oh, my goodness, but we have to construe by the law, don't we? I don't think that that is – I mean, the standard would be incredible. You'd say – you'd have it in writing, say I was excited about a job, but now you bring a suit and you say, well, I said that, but now I really, really, really wanted to be a supervisor, even though I remained a GS-13. As a matter of fact, later – I think it has to be taken in the context of the two reassignments. If there was just one reassignment that this fourth-line supervisor had offered her, then, yeah, it's a little bit more murky about this email saying thank you for this opportunity. But the fact is she wanted to get away from this extremely bad transfer, that she was appreciative, and I don't think that that destroys the voluntariness of her – So in the legal context, you're saying the issue is a jury question, that there is a disputed issue as to whether she actually was accepting the second demotion, the demotion outside her division? Is this what you're saying? Her choice was between the two nonsupervisory roles. Yeah, you're saying there were two bad options. Yes. And that she wasn't accepting either one of them, that she was grateful for being given the opportunity for a one that was less – Yes. I think that's distinguishable from the case that the district court relied on, where there was this negotiated agreement to be in a different position. How would the employer ever have a defense? I mean, for example, every case, you would just say that, you'd be like, well, I control my own feelings, and I felt that this was a demotion because I want to be a supervisor. What would be the defense to that? I mean, I can't go inside your mind. I don't know what you're thinking right now. But if you said that's what I'm thinking, I can't really challenge that because I can't get into your mind. But we do have evidence that she said she was excited, and it was in writing. So you're saying that that would withstand any summary judgment motion always because you could never get in her head what she really was thinking, right? I think the case that the court relies on, where there was agreement with a reasonable accommodation and a new position, like that kind of situation, you can see that that was voluntary. But she put it in writing. She said she was excited about it. It was in writing, wasn't it? It's between the two bad choices, though. At this point, she's mitigating her damages as she has an obligation to do. Can I just add? I want to make sure I understand the facts. So she's told at this September 27th meeting, you're going to be a management analyst. You're not going to be a supervisor. You will be a management analyst. And so you would say that's the demotion. Yes. And then she's told instead of being a management analyst in one branch, you could be a management analyst in a different branch. But either way, it's a management analyst position. And it's a demotion. And your position is, sorry, your view is that that is a demotion from being a supervisor. Correct. Okay. So the demotion happens on September 27th. And after that, there's some jockeying about in which office she will perform this demoted position. Correct.  And I think there, obviously, there are some exceptions. Some people don't want to be supervisors. But, I mean, as far as a hierarchy goes, generally, a supervisor position is one of higher prestige. And Ms. Eddington, the supervisor of the plaintiff, even acknowledged that in her deposition. Like, this is taking away your duties. That would be a negative. Is that a jury question or something that you think a court can decide as a matter of law? Whether after Muldrow, whether this was an adverse action? Putting to one side the voluntariness question. Would that go to a jury or do you want the district court to consider that question as a matter of law? To determine whether there is some harm? Yeah. Whether or not what happened here counts as an adverse action under Muldrow. I mean, I think that is something that the district, I mean, defendants are still going to cover, file summary judgments even after Muldrow. And that is the question for the court. And I think they can see that there is some harm. So you think a district court could, just as a matter of law, this was an adverse action? Because I think that sort of takes you back to Judge Keenan's question about, well, sometimes a loss of supervisory duties wouldn't, in every context, be an adverse action. Yeah. I mean, I still think it depends on the context. Yeah. I'm sorry. I didn't mean to interrupt. But maybe it would be helpful in the context of Judge Harris's question if you could tell us what the disputed issues of material fact are in this case that preclude summary judgment. And whether it was an adverse action, is that a disputed issue of fact? Is it a mixed question of law and fact? What do we have here? I think it's a mixed question of law and fact. I think it is certainly, before a jury, the defendant can raise the question of voluntariness and cite to this email. But I think that that's something that the jury, as the finder of fact, looks at the context, looks at the credibility of these witnesses as to, you know, what is being offered to her, why it's being offered to her. And that's a question for the jury to ultimately determine, you know, what the harm is. But I'm interested in manager many times is a connotation, at least, that you do supervise people. I mean, for example, say, what do you do? I'm a store manager. Well, I've never been in a store before, but intuitively, I would think, oh, then you manage the people who are sale clerks. Wouldn't you? And that's supervising them? Isn't that supervising? Yeah. Right? Yeah, a store manager, I would say, is a supervisor. Or the manager you're doing here, too. What are you managing? Not people? I guess maybe what is a management analyst? What does a man do? Oh, I see. I'm sorry. It says manager. I mean, I wouldn't suggest that she worked at a store. I think that was pretty clear. What I'm saying is that she's a manager. What does she manage? Who does she manage? She's not a management analyst. Oh, management. Yes. Oh, not manager. Yeah, so she's not supervising anyone in this capacity. And she didn't want to do that? She wanted to be a supervisor. On any circumstances, she would be excited about it. You're saying it's totally a Hobbesian choice. That's what you're saying. Yeah, she did not want to be a management analyst in any division. So then I could see. I don't see how in any circumstance, in terms of a fact question, there would be anything but the jurors that look people in the eye and who's credible and who's not credible. Yeah. But you said this case started in August, but didn't it start problems in April? Some issues? Well, they go back in time to try to build a case together. She received a positive midterm evaluation in April, and they claimed that there were performance issues. Right. That was well before she filed any kind of suit. They did not bring that to her attention until afterwards. So after she made a reasonable accommodation request, then they went back, put together a list of her alleged transgressions, and said, you have performance issues. But she said there was a question of she said, I didn't have a time frame, so it's not late. So that incident, she knew what they were talking about.  Wasn't it a question about an assignment she had? With her evaluations? With April. In April. Yeah. There was no question about her performance at all? Job performance? No. Okay.  Good morning. May it please the court, Matt Shea of the United States, and the appellee, Leland Dudick, the acting commissioner of the Social Security Administration. This case is about an employee who voluntarily accepted a reassignment. Counsel, I have so many questions about the voluntariness here. The allegation, at least I think, is that the decision is made to reassign the plaintiff to a non-supervisory management analyst position. That's not voluntary. It's a decision made by her employer. She's informed of it. And that's the adverse action. And then after that, she is sort of allowed to pick between two management analyst positions. But I don't see how that makes the original decision to make her a management analyst. I don't see how that makes that voluntary. Do you see what I'm saying? Let me give you a hypothetical. What if I say to someone who works for me, sorry, I'm going to let you go. You can leave now or you can stay until the end of the week. And he says, I'll stay until Friday. And I'm so excited about the opportunity to stay until Friday. It seems that your position would be now he has voluntarily quit rather than being fired. I would not say that for that hypothetical. Okay, well what's the difference between that and what's alleged here? Yeah, so the opponent in this case talks about this first transfer. There was no first transfer. Right, I agree. It looks to me like there was one demotion and then she got to pick in to work under this demoted title. So I would say it differently. There was an initial discussion with her second and third line supervisor where her opponent was told you'll become a management analyst. But she did not want that position. So she said no. She reaches out to the fourth line supervisor, Jim Julian. If she says no, they tell her you're going to become a management analyst and she says no, I'm not? Right, she reaches out. So that's a conversation with the second and third line supervisor. But you believe when she is – because I did not see that in the complaint, that when she is told from now on you'll be a management analyst, she said no, I won't, and I'm going to take steps to make sure that won't happen. Like I don't recall her anywhere in discovery any indication that when she was told you're going to be a management analyst, she said, oh, no, you've got another thing coming. That's not happening. So I think that it was an in-person meeting and I don't know what words exactly were spoken. Right, I'm pretty sure – okay. But what happens after that meeting is that Ms. Herkert reaches out to Jim Julian, the fourth line supervisor. Right, so let me find the timeline here because it's important, I think. So on September 27, 2017, Ms. Herkert is told she'll be reassigned to the position of management analyst in the Office of Building Management. Excuse me, where she was. She's told that that will happen. That's correct. She did not want that position, so the agency did not force her into it. After that September 27 meeting, Ms. Herkert reaches out to Jim Julian. He's the fourth line supervisor. September 27 was a Wednesday. Ms. Herkert's on leave Thursday the 28th and Friday the 29th. That's at JA 224. The following Monday is October 2, 2017. Ms. Herkert meets with Mr. Julian on that date. Because Ms. Herkert did not want the previously proposed position, Mr. Julian offers an alternative. She accepts. Two days later, October 4, 2017, Ms. Herkert emails Mr. Julian expressing her appreciation. She said she was very excited about the transfer and most grateful to him for making it happen. Ms. Herkert is essentially asking the court to ignore this timeline and instead rule out another. I don't think she is. I think she's saying that a jury gets to figure out what happened here because even just sort of the text you are reading, I think a reasonable jury could say here's what happened. First she gets demoted to management analyst, and then she gets to bargain a little bit about in which office she will work as a management analyst. I don't think there's only one way to understand what you just read me. Well, again, there's no first transfer. There's no SF50, for example, saying that she's in this management analyst position in OBM. It's only the second, what Pelham calls the second transfer. It's only the new position as a management analyst doing nationwide leasing that happens. So the proposed position I don't think can be seen as an adverse action. It's something raised in a meeting. It never goes through. It never happens. She never works that job, even for a day. So the issue of Ms. Herbert voluntarily accepting the reassignment is dispositive of Counts 1 and 2. Count 1 was disability discrimination, and Count 2 was retaliation. We've been over the email. This is at JA196. This is the critical email in this case. She says, I am very excited for the opportunity to participate in our national leasing initiatives. I am most grateful to you for making it happen. The email shows that the assignment was not just voluntary. She's excited about it. She says that was a Hobbesian choice. Can you explain that? That's important here. She said that it's like hitting you in the head with a hammer. It feels nice to stop, but you're still hitting the head with a hammer. Ms. Herbert doesn't point to any authority saying because this first position was proposed, therefore the second is not voluntary. It's not exact, but it's very similar to what the facts in Laird v. Fairfax County. In Laird, the court held, if an employee voluntarily requests a transfer and the employer agrees to it, there is no actionable adverse action. That's similar to what happened here. Ms. Herbert is arguing that her case is different because of this first proposed reassignment. She says the court shouldn't set focus on that position. That's telling because the case really is similar to Laird. She never worked in that other position. She said no to it, asked for something different. The agency says okay. Can you help me? What is a management analyst? It's interesting. When she was a supervisor, she was at the same grade, not only the same grade, but also the same step. What's the difference? Normally, if you're a supervisor, you make more money. There's no loss of money, neither grade nor level or scale. You work with anybody in a cubicle as a management analyst? You don't deal with people? Sure. Your point was absolutely correct. She's making the exact same salary, same grade, all of that, same benefits. She's managing a team of six. She's working in her previous position when she was a supervisor. She's managing what's called the outlying buildings of the Social Security Administration's headquarters. It's the least buildings on their campus. She has a team of six. She's in charge of reviewing the contracts, the work orders for these specific buildings, a few buildings, janitorial services, pest control, trash removal, these kind of things. That's what she's doing before. When she becomes a management analyst, she shifts to nationwide leasing, procuring spaces for the agency nationwide. The Social Security Administration is everywhere. She's now working on national leasing initiatives. In her email, she says she's excited about that. This is similar to what she was doing on track for at GSA. Before she came to this agency. Counselor, are you defending, the district court said there was no adverse action on two grounds. One was it's voluntary and the other was that there's no cognizable harm here. This was, of course, before Muldrow. The district court said there's not a significant harm. Are you defending that second rationale post-Muldrow? You think there's just no harm here at all between these two jobs? I am. I would say the court should affirm for the first reason that's the primary holding. That was the main point of the analysis in the district court's opinion. I think the court should affirm for that reason. I would say there's no harm here. As a matter of law, losing supervisory responsibilities can never be a cognizable harm? I wouldn't say never. It's certainly a factor that the court would consider. It's one piece of the puzzle. If the benefits are the same and the step and the grade are the same, if all that's happened is you've lost your supervisory responsibilities, that's not a cognizable harm? If that's all that happened, it would be a different discussion if, for example, she was actually placed in that first management analysis. I'm asking you, the district court treated these as alternative. One was the voluntariness issue, but putting that all to one side, assume this is not voluntary. Then if salary is the same, benefits are the same, grade and step are the same, and the only difference is you're not supervising anymore, is that a cognizable harm? It's not in this case. Okay, why not? For a reason that has nothing to do with the voluntariness. The Supreme Court in Burlington or B. White says this is an objective standard, not subjective. What would a reasonable employee think based on the totality of the circumstances, all the circumstances? Does that make it a jury question? Not necessarily. I think the court could find as a matter of law here that there is no harm whatsoever. Why not? If she used to be a supervisor and now she's not anymore, that seems pretty important to me. Again, it's one factor. What are the others? What are the other factors? The work and the new position is nationwide leasing. She's managing a few buildings and now she's procuring space for the agency nationwide. Yeah, but she used to be a supervisor, and you're saying that wouldn't even go to a jury, whether that counts as a harm? So what if the employer had said, look, it just feels weird to me to have women bossing men around, so everything else is going to stay the same, you're not going to be a supervisor anymore, but same pay, same benefits, same grade, and you know what? To sweeten the pot, now you get to work on national leases. That's fine. That's not a Title VII problem. I think that would be a very different strategy.  I've kept all of the relevant factors the same as your hypothetical. All I've added is it seems kind of like a bad motive, but is that something you would say, whether there's been a cognizable harm or not as a motive? Because that sounds like a jury question. So I would say the question of this, if this reaches harm, could be a jury question. But to your point of the employment discrimination and the hypothetical, the facts here are extremely different. Yeah, but usually when we consider whether there's been an adverse action, that is a question that is distinct from why it happened. That's what you get to when you start shifting burdens. So I guess I was looking for an answer that didn't turn on something that's not relevant to that inquiry. But in the context of this case, in the sense that it could be viewed as a reasonable accommodation, because wouldn't this job give her more opportunities to have the episodic or scheduled virtual, because then she would have more opportunity? And that's where it all started, from needing this medical purpose, wouldn't it? When accommodation means you don't get exactly what you want, it has to be a reasonable accommodation. That is, you don't lose any pay, same status. We know that it's something you don't have to learn because you've done it before, so it's no transition. But definitely you say, oh my goodness, I got to learn a whole new area I've never done before. Like the GSA, she did this. And then also the question whether it doesn't matter, is this unreasonable accommodation? So I would say that it's a reasonable accommodation here. And there's no question that she got, in terms of an accommodation, setting aside the job title and the actual job, but she's getting the telework that she requested. That's not a dispute. She's able to work the two days a week, plus the additional episodic day as needed. That's undisputed. Now if the question of voluntariness is a jury question, let's just say we disagree with you. What happens to the reasonable accommodation analysis? In other words, if you can't say on this record that she voluntarily accepted this job as a matter of law, then how can you say it was a reasonable accommodation as a matter of law? There seems to be some tension there, doesn't there? Not necessarily. The supervisory position, the agency policy, was that except for a possible one day of telework, the supervisor needed to be on-site. That's just the rule, right? She's working, she's managing those specific buildings. Her employees are in those specific buildings. The agency wants someone on-site for that role. Whereas the management analyst position, she's doing nationwide things. It doesn't matter so much if she's working from home or at her desk in the office. I would say it's a reasonable accommodation to put her in a position that's the same pay, same grade, same opportunities for advancement, of course, because she was as promoted as the previous position. Even if the court finds it's not clear whether there was some harm, Ms. Herker cannot show that the agency's reason for her reassignment is pretext. The agency reassigned Ms. Herker due to her poor performance in the previous role, particularly her poor performance as a supervisor. She failed to complete required reviews for her subordinates. This is a fundamental aspect of being a supervisor. Plaintiff admits that she failed to timely complete these reviews. This is at the opening brief at page 27. These were supposed to be done in April. In paragraph 47 of the complaint on JA-12, Ms. Herker admits that she did not get to them until mid to late August. She just did not review her employees. She made the jobs of her second and third line supervisors more difficult. The clearest evidence here is an email. This one's at JA-167 through 169. This is dated June 22, 2017, well before there's any mention of reasonable accommodation. And this is from Ryan Felber, who's Ms. Herker's third line supervisor. In the email, Felber asks Ms. Herker to refrain from engaging in policy disputes with other components and to utilize her chain of command. He wrote, Kelly, this is Kelly Barr, the second line supervisor, and I have been consumed as a plate in smoothing over issues that have been caused by your emails. So again, this is June, well before any mention of reasonable accommodation. I thought so, too, in the record. The counsel suggested it was manufactured, I guess, in August. Go ahead. Then there are numerous instances in which Ms. Herker failed to complete a task, even after several reminders, requiring her supervisor to step in and complete the task herself. Counsel, I guess her argument, I'm sorry, your colleague's argument on behalf of her client is that even if there were, whatever performance concerns there were back in the spring, nobody told her anything about it until right after she started complaining. That's not true. So I'm giving you emails that are, you know, they were to her, correct?  So the email I just mentioned was an email from her second and third line supervisor to Ms. Herker. Here's another. She failed to get back to the Office of General Counsel. This is discussed in the briefing. Again, this is an email. This is JA-171. And the emails are between Sandra Eddington, the first line supervisor, and a senior attorney at OGC, the Office of General Counsel. And so this email is dated July 3rd, 2017. The attorney at OGC explains to Ms. Eddington that they've been waiting on Ms. Herker to supply the information since March of that year. Another one is that she didn't approve the credit card purchases of her subordinates. Again, a common task for a supervisor. There are emails from that time showing Ms. Herker's supervisor reminding Ms. Herker multiple times, and then ultimately just doing it herself. This is JA-179 through 180. And this is early August 2017. But she had started... I mean, I guess I have to look at the timeline. I thought in July 2017, she starts to sort of seek, I want a standard two days a week as an accommodation. But I might be getting the timeline wrong. You're saying she doesn't seek an accommodation until August? I believe that's right, Your Honor. So I have August 21st, 2017. Ms. Herker made a verbal request for accommodation. The cipher that is JA-24. And then the formal request is August 29th, 2017. This is when Ms. Herker submits it through the... Right, I know the formal request is later. So you don't have her seeking a two days a week accommodation in July. I have August 21st, 2017. That's the meeting where she verbally requested. No, that's the meeting. But she hasn't asked for, I would like... Okay, it doesn't matter. Yeah, so August 21st is the meeting and that's when you would start the date, the clock running for protected activity. There's no protected activity before August 21st? That's correct. Okay. So there are additional examples. This is pages five through eight of the agency's brief. But in sum, Ms. Herker is failing to do parts of her job and way too much is falling through the cracks. So that is the reason. Her performance is the reason to reassign her. In response to all this, Ms. Herker argues that the agency's reason is pretext just because she wasn't given an opportunity to improve. But she was. We went through the emails, right? She's told by Ms. Eddington, by Mr. Bard, over and over in these emails, you know, like, where is this? She knows there's a problem. She just doesn't address it. Finally, as for the failure to accommodate in count three, summary judgment is appropriate because Ms. Herker was granted a reasonable accommodation. Ms. Herker requested the ability to telework. The agency allowed her to telework twice per week and requested an additional episodic day as needed in her new management analyst role. In closing, I ask that the court affirm the district court's decision for four reasons. First, Ms. Herker voluntarily accepted the reassignment. Second, Ms. Herker did not suffer any harm with the reassignment. Third, Ms. Herker cannot show the agency's legitimate reasons for the reassignment are pretext. And fourth, because the agency granted a reasonable accommodation, Ms. Herker cannot prevail on a reasonable accommodation plan. All right. Thank you, counsel. Thank you. Ms. Bard, you have some time reserved. Excuse me, is the light not working? The timer is on the screens. Oh, okay. You know, this time it's not working. Okay. We're not using that. You don't use it? Okay. A couple things in response to my colleague. First, Judge Harris, you are correct that the timeline of July, she did have a conversation with Ms. Eddington. The site to that is day 247 where she, the plaintiff testified that she had a conversation in July of 2017 about reasonable accommodation with Ms. Eddington. Given this argument about the... She had a conversation about reasonable accommodation for a long time. When she started, you talked about that.  That doesn't mean anything. What does July mean? Right. But kind of a more formalized at that time. All right.  The argument that there's only one transfer really does not make sense in the context of the email, the October 1st email that is at JA 450. I mean, the language there clearly says, effective October 1st. I'm sorry, it's a September 28th email. Effective October 1st, 2017. This is your new position. She was told to report to that position effective that date. And in response, she reached out to her fourth level supervisor. I would contend that there's no case law here that's directly on point because it's just common sense. This is not voluntary when you have a choice between two bad options. Choosing the lesser evil does not make it voluntary. With regard to the no loss of money, the position that she was originally transferred to, the one that she used to supervise, was a grade lower. Now, they didn't change that in our argument is because they wanted to avoid all the red tape that goes along with that. If that was a specific demotion, I mean, that would be appealable to the MSPB. So by not making these changes, they are avoiding those requirements. It's also called reasonable accommodations, too, isn't it? That's a spin you put on it, but it's also a reasonable accommodation. You don't want a person to suffer loss of benefits and payments. And you make that a nefarious act. Well, I... Don't you? In this context, yes. I think they are acting with a nefarious purpose. I see. Because, I mean, as an accom... Like, she could do this position with two days of telework. They're saying that she had to be on site. But that is completely undermined by the fact that Ms Eddington, who took over the duties after Plaintiff left, was not on site. She did all of those duties at a different facility. So to say that Plaintiff would not be able to do this job... Was she teleworking? She wasn't teleworking, but she was not on site. Yeah, but... And they're saying the Plaintiff had to be on site to do this job. But, obviously, that's not true, because Ms Eddington was not on site. Um... So, yes, the loss of supervisory duties, I think, is the real key here. You know, defendant is arguing that, you know, she did get a promotion again to supervisory duties. I think that just shows that those are her career goals. She has wanted to be a supervisor. That is what she enjoys. So the fact that she has been able to claw her way back up... So this transfer didn't hurt her career goals either, then? Because she was able to get where she wanted to go. It's a setback. I think a setback is still an adverse action. Well, she wasn't a 14. She's a 14 now, right? Is she? Actually, I'm not sure what the grade level is. But she is in a supervisory position. She is good at that role. So I think the agency's argument that, you know, she just didn't have the interpersonal skills to do this job and this is necessitated is just not believable. I think there is just loads of pretext in this case. And I think the agency took these actions against her because of her protected activity and her protected class. Do you have any other questions? No? Okay, thank you. Thank you, counsel. All right, we'll come down to recounsel and proceed to our next case.
judges: Roger L. Gregory, Pamela A. Harris, Barbara Milano Keenan